IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 3:22-CR-264 |
| | : | (JUDGE MARIANI) |
| | : | |
| JAMES RAYMOND ALBERTO, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On July 26, 2022, a federal grand jury indicted Defendant James Raymond Alberto

with Felon in Possession of Firearm (Count 1), Drug User in Possession of Firearm (Count

2), and Possession of a Stolen Firearm (Count 3).

A three-day jury trial was held beginning on May 5, 2025. On May 7, 2025, the jury

returned a verdict finding Defendant Alberto not guilty of Count 2 of the Indictment (Drug

User in Possession of Firearm) and guilty of Count 3 of the Indictment (Possession of a

Stolen Firearm). (Doc. 95). The jury further answered two special interrogatories, wherein

they found that Alberto "on or about August 12, 2021, knowingly possessed the Kel-Tec,

Model PF-9, 9mm, semi-automatic pistol, Serial Number SA 159" and that Alberto

"possess[ed] the Kel-Tec, Model PF-9, 9mm, semi-automatic pistol, Serial Number SA 159,

in or affecting interstate or foreign commerce." (*Id*. at 2). Following the jury's verdict as to

Counts 2 and 3 of the Indictment, the jury heard evidence on, and deliberated as to, Count 1

of the Indictment (Felon in Possession of a Firearm).  The jury thereafter returned a verdict

of guilty as to Count 1.  (Doc. 98).

Presently before the Court is Defendant Alberto's "Motion for New Trial and to

Vacate Judgment" (Doc. 103), brought pursuant to Federal Rule of Criminal Procedure 33.

For the reasons set forth below, the Court will deny the defendant's motion.

## II. STANDARD OF REVIEW

A defendant may move for a new trial pursuant to Federal Rule of Criminal

Procedure 33.  Rule 33 provides in pertinent part that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires. . ."

Fed. R. Crim. P. 33(a).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a
> Rule 33 motion it does not view the evidence favorably to the Government, but
> instead exercises its own judgment in assessing the Government's case."
> *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if
> a district court believes that the jury verdict is contrary to the weight of the
> evidence, it can order a new trial "only if it believes that there is a serious
> danger that a miscarriage of justice has occurred – that is, that an innocent
> person has been convicted." *Id.* (citation and quotation marks omitted). . . .
> Such motions are not favored and should be "granted sparingly and only in
> exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir.
> 1987) (citations omitted).

*United States v. Silveus*, 542 F.3d 993, 1004-1005 (3d Cir. 2008).  The defendant "bears

the burden of persuading the trial court that the interest of justice requires the grant of a

new trial."  *United States v. Ray*, 2016 WL 5787345, at *3 (M.D. Pa. 2016) (quoting *United*

*States v. Hammer*, 25 F.Supp.2d 518, 534 (M.D. Pa. 1998)) (citing *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719 (E.D. Pa. 2009)).

Further, "[t]he discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated." *United States v. Smith*, 139 F.App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993)). Where a defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

## III. ANALYSIS

Defendant Alberto's "Motion for New Trial and to Vacate Judgment" (Doc. 103) asserts that "[t]he Government's evidence was insufficient to convict Defendant on [Counts 1 and 3] since there was insufficient evidence at Trial for a Jury to determine that Defendant knowingly possessed a firearm as alleged in the Indictment" and that the "jury was confused on what constituted knowledge and possession to establish Defendant's guilt beyond a reasonable doubt and as a result the Guilty verdict needs to be set aside in the interest of justice." (Doc. 103, ¶¶ 4, 5).[1]

---

[1] Although Defendant references the "sufficiency of the evidence", Defendant's motion and accompanying brief make clear that Defendant's motion is specifically limited to a request for a new trial pursuant to Fed. R. Crim. P. 33 and is not asserting a basis for relief under Fed. R. Crim. P. 29.

3

Here, the Government presented sufficient evidence for this Court, and a reasonable trier of fact, to conclude that Defendant knowingly possessed the firearm at issue, specifically, the Kel-Tec, Model PF-9, 9mm, semi-automatic pistol, Serial Number SA159.

At trial, Daniel Duffy, who was employed as a patrol officer with the City of Wilkes-Barre, on August 12, 2021, testified. (Trial Tr., May 5, 2025, at 98). On the morning of August 12, Officer Duffy testified that, while driving during his shift, he observed a car at a stop sign, with a line of cars behind it, and that the person in the stopped car "was hunched over." (Id. at 99). After parking his patrol car in front of the stopped car, he approached the vehicle, "gained the person's attention", and confirmed that the driver was Defendant Alberto. (Id. at 99-100). At the request of Officer Duffy, Alberto stepped out of the car and consented to a search of his vehicle. (See id. at 103).

The vehicle had "New Jersey tags" and a "New Jersey inspection" and when Officer Duffy ran the license plate of the car, "[t]hey came back to a rental company or holding company" which Officer Duffy explained meant that the car was "a rental vehicle out of Enterprise or one of the rental entities." (Id. at 101). Officer Duffy admitted that he did not know who rented the car. (Trial Tr., May 6, 2025, at 18-19).

When searching the car, Officer Duffy testified that he found items belonging to Alberto in the front seat, back seat, and trunk of the car. (Trial Tr., May 5, 2025, at 119). Officer Duffy's testimony, the videos of the incident from the body cameras of Officer Duffy

4

and Wilkes-Barre Police Officer Bernard Magagna,[2] and other exhibits admitted into

evidence at the trial, establish that items located inside the vehicle driven by Alberto and the

trunk of this vehicle, included but were not limited to: "rolling papers", two "chunks" of

marijuana, multiple cell phones, lottery tickets, cigarettes, two partial straws, a tiny spoon, a

green ski mask, "a lot of garbage", pizza boxes, empty plastic drinking bottles, "different

trimming things in the trunk of the car used to cut hair", and a pill bottle with the name

"James Alberto" on it.  Officer Duffy's body camera video also shows that the floors in the

interior of the car appear dirty, including being covered in hair, crumbs, and white stains

(*see e.g.*, Gov. Ex. 1.5 at 10:00-10:17).  When told that the car was going to be impounded

and asked what he needed from the car, Alberto took several minutes looking through the

car, and asked for a number of items which he identified as his own, including his keys, his

knife, his "son's headphones", two "clickers" which were garage door openers, a lighter from

Virginia Beach, his "allergy pills", his cell phones, chargers, and his lottery tickets (Gov. Ex.

1-5, at 22:17-27:00, 28:36-30:40).  With the exception of a woman's purse and women's

clothes found in the trunk of the car, there was no indication that any other items located in

the car or the trunk of the car belonged to any person other than Alberto.[3]  (*See also*, Trial

---

[2] Officer Magagna arrived at the scene shortly after Officer Duffy and acted as a "back up officer just for officer safety" during Officer Duffy's search of the vehicle.  (Trial Tr., May 6, 2025, at 58).  Officer Magagna stayed near Alberto for the entirety of the search of the vehicle, and thus his body camera video, entered into evidence as Government Exhibit 1.6, shows the same events as those depicted on Officer Duffy's body camera video but from a different angle and perspective.

[3] Alberto informed Officer Duffy of the identity of the woman who owned the purse and clothes, supporting a reasonable conclusion that he was the primary user of the car and aware of any items

Tr., May 6, 2025, at 48 (Officer Duffy opining that Alberto was "the person who primarily drove this vehicle based upon what I observed."); *id*. at 66 (Officer Magagna testifying that that Alberto took ownership of the things in the car)).

Although Officer Duffy searched the inside of the vehicle and the trunk, he was unable to search the glove compartment because it was locked. (Trial Tr., May 5, 2025, at 109). Alberto stated twice to Officer Duffy that he did not have the key for the glove compartment. (*Id*. at 109-110, 111; Gov. Ex. 1.5 at 10:19-10:24, 20:56-21:00). As a result, Officer Duffy testified that he applied for, and received, a search warrant for the glove compartment of the vehicle. (Trial Tr., May 5, 2025, at 124). While at the impound lot to execute the search warrant, another police officer showed Officer Duffy that the key for the glove compartment was located inside the key fob for the car, which was in Alberto's possession at the time of the traffic stop. (*Id*. at 132). When Officer Duffy executed the search warrant, he found a loaded firearm in the locked glove compartment (*id*. at 125-126), later identified as the Kel-Tec, Model PF-9, 9mm, semi-automatic pistol, Serial Number SA159.

Defendant does not dispute that the evidence presented at trial established that the firearm recovered from the glove compartment was stolen.[4] (*See e.g.* Trial Tr., May 6,

_____

contained in the vehicle. Further, there was no evidence or suggestion that this woman ever drove or had control over the vehicle.

[4] Although it is undisputed that the firearm was stolen, there was no evidence that Alberto himself stole the firearm or evidence as to how he acquired, or otherwise came into contact with, the firearm. (Trial Tr., May 6, 2025, at 34).

2025, at 5-8 (Officer Duffy testifying that the gun was reported stolen); *id.* at 126-127
(William Brizzy testifying that he owned the Kel-Tec 9mm pistol, never completed any
paperwork transferring that firearm to anyone else, discovered the firearm was stolen in
"mid-summer" of 2021, and "immediately" filed a report to the police reporting the firearm as
stolen); *id*. at 129-131 (PSP Trooper Anthony Caputo testifying that on July 1, 2021, he
responded to Brizzy's residence for a report about three stolen firearms, including a Kel-Tek
pistol, Serial Number SA159)).

  This testimony and physical evidence admitted at trial leads to the reasonable
conclusions that the rental car had been frequently used since the time of its rental and that
Defendant Alberto, who was driving the vehicle on August 12, 2021, and admitted to driving
the vehicle at other times, and who claimed ownership of a number of the items in the
vehicle at the time of the initial search on August 12, 2021, was the principal user of the
vehicle.[5]  The evidence also clearly shows that a loaded firearm was recovered in the
locked glove compartment of the rental car driven by Alberto and that Alberto had the key to
access this locked glove compartment.  Although this evidence, standing alone, may
arguably support Defendant's position that "an examination of the Government's evidence
to prove knowledge and possession was circumstantial" (Doc. 104, at 6), further evidence at
trial clearly supported a finding that Alberto had possessed the Kel-Tek firearm.

---

[5] Further supporting this conclusion is the exchange which took place during the initial conversation
between Alberto and Officer Duffy, wherein Alberto asked Officer Duffy if he remembered "the other day,
when you pulled up next to me" while Alberto was driving this same car.  (Gov. Ex. 1.5, at 2:35-3:11).

Evidence was introduced at trial that the firearm recovered from the locked glove compartment was sent for DNA swabbing and a functions and operational check to verify that it was a working firearm. (Trial Tr., May 6, 2025, at 9). Although no fingerprints were found on the firearm, based on the DNA report, Officer Duffy applied for, and obtained, a search warrant for a sample of James Alberto's DNA. (Trial Tr., May 6, 2025, at 9-10, 20).

At trial, Sarah Worsnick, a forensic scientist II with the Pennsylvania State Police ("PSP"), was admitted without objection as an expert in "forensic science generally and serology in particular." (Trial Tr., May 6, 2025, at 86, 90). Worsnick testified that, in this case, she swabbed the handgun, magazine and rounds of the firearm at issue for potential touch DNA, specifically, "the rough and textured areas of the grip, trigger and slide of the handgun, just the edges of the magazine and just the stamped ends of the rounds." (*Id.* at 92, 94). She then took cuttings from the swabs and placed them into a tube, which was placed into an envelope, signed, sealed, and sent to the DNA laboratory. (*Id.* at 95).

Following Worsnick's testimony, Timothy Gavel, a forensic DNA scientist for the PSP, was admitted without objection as an expert in the field of forensic DNA science. (Trial Tr., May 6, 2025, at 97, 102). Gavel testified that he was provided two items for DNA analysis. The first item was a sealed envelope containing two swabs of "grip, trigger, and slide of Kel-Tec 9mm handgun (Serial Number: SA159), magazine, and seven (7) rounds of Hornady 9mm ammunition." (*Id.* at 105; Gov. Ex. 5.1 (DNA Analysis report dated February 17, 2022)). Gavel's DNA Analysis report, admitted at trial, concluded that the swabs yielded

8

"a DNA profile, consistent with a mixture of at least three (3) unidentified contributors. . ."
(Gov. Ex. 5.1; Trial Tr., May 6, 2025, at 109-111).  The second item, tested by Gavel at a
later time, was a sealed envelope containing a buccal collector from Alberto.  (Trial Tr., May
6, 2025, at 111-112; Gov. Ex. 5.2 (DNA Analysis report dated March 3, 2022)).  Gavel
developed the DNA profile for the known sample received from Alberto and then compared
this sample to the DNA profile from the first sample taken from the handgun.  (Trial Tr., May
6, 2025, at 113).  Based on this comparison, Gavel testified that Alberto could "be included
as a potential contributor to this mixture profile."  (Trial Tr., May 6, 2025, at 113; *see also*,
Gov. Ex. 5.2).  Consistent with his second DNA Analysis report, Gavel explained that "it's 32
octillion times more likely that this mixture is a combination of James Alberto and two people
versus three completely unknown people. So it's 32 octillion times more likely that his DNA
is included in this mixture as opposed to not being included."  (Trial Tr., May 6, 2025, at
114-115).  Gavel further testified that Alberto contributed "the most DNA for this particular
item [the handgun swab] based upon the DNA profile that [he] received" (*id*. at 122).

The testimony of Worsnick and Gavel, in conjunction with the testimony and
evidence establishing that the Kel-Tec firearm was found in the rental car driven by Alberto
on August 12, 2021, leads to the reasonable conclusion that the firearm at issue was, at
some time, physically possessed by Alberto.

When reviewed as a whole, the afore-stated evidence leads to the reasonable
conclusions that Defendant Alberto was the primary operator of the rental vehicle and

9

physically possessed the Kel-Tec firearm and ammunition on one or more occasions.

Nonetheless, Defendant appears to argue that there was insufficient evidence to prove

beyond a reasonable doubt that Alberto knowingly possessed the firearm "on or about

August 12, 2021" as set forth in the jury interrogatory on the verdict form (Doc. 95).

As this Court instructed the jury when defining "possession":

> The Government does not have to prove that the defendant physically held the firearm, that is, had actual possession of it. As long as the firearm was within Mr. Alberto's control, he possessed it. If you find that the defendant either had actual possession of the firearm or had the power and intention to exercise control over it, even though it was not in his physical possession – that is, that the defendant had the ability to take actual possession of the object when he wanted to do so – you may find that the Government has proven possession. Possession may be momentary or fleeting.

(Doc. 91 at 17; *see also*, Trial Tr., May 7, 2025, at 74-75).[6]  The jury was also cautioned that

"mere proximity to the firearm or mere presence on the property where it is located or mere

association with the person who does control the firearm or the property is insufficient to

support a finding of possession" (*see* Doc. 91, at 18).  Here, the evidence presented at trial

can reasonably establish, beyond a reasonable doubt, that even if Alberto did not physically

possess or touch the Kel-Tec on August 12, 2021, he still had constructive possession of

the firearm on that day where: (1) he had previously held the firearm and ammunition, as

demonstrated by the presence of his DNA on the firearm; (2) he was the principal user of

---

[6] At trial, the Court provided each juror with a copy of its final jury instructions (Doc. 91) and thereafter read the instructions aloud to the jury as the jurors read along.  The jurors were instructed to take their copies of the instructions to the jury room for use during deliberations.

the vehicle in which the firearm was found and had the key to the locked glove

compartment, and therefore either placed the firearm in the glove compartment or knew it

had been placed there; (3) the firearm was purposely and voluntarily placed in the glove

compartment; and (4) as a result of his dominion over the vehicle, his knowledge of the

presence of the firearm and its location, the firearm was knowingly in Alberto's control and

he had the ability to take actual possession of the firearm on August 12, 2021. *See e.g.*

*United States v. Guyton*, -- F4th --, 2025 WL 2014930 (3d Cir. 2025) ("To prove constructive

possession, the Government was required to demonstrate that [Defendant] knew about the

guns and exercised dominion and control over the area where they were found.").[7]

Defendant further argues that a question submitted to the Court by the jury during

deliberations demonstrates that the jury was "confused on the issue of when possession

---

[7] In *Guyton*, following a jury verdict finding the defendant guilty of nine drug-trafficking, firearm, and money laundering offenses, the Third Circuit Court of Appeals vacated the defendant's conviction on Count 3 for felon in possession of a firearm. Count 3 charged Guyton, a felon, with unlawful possession of two firearms which were recovered in a duffel bag found in an abandoned house next door to the defendant's residence. In determining that no reasonable jury could find that Defendant constructively possessed the firearms stored in the abandoned house, the Circuit noted the following lack of evidence: (1) no DNA, fingerprint, or other forensic evidence tying Guyton to the firearms; (2) no evidence that Guyton was ever present in the abandoned house, had a key to the house, or kept any personal belongings in the house; and (3) no evidence that Guyton tried to hide or destroy the firearms/contraband. *Guyton*, 2025 WL 2014930 at * 3-4.
  The Third Circuit's focus on the lack of evidence in *Guyton* buttresses this Court's determination that the Government set forth sufficient evidence to establish, beyond a reasonable doubt, that Alberto had constructive possession of the firearm on August 12, 2021, recovered in his rental vehicle. Here, Alberto's DNA *was* recovered on the firearm, Alberto *was* driving the vehicle where the firearm was found, had keys to both the vehicle and locked glove compartment, and had a number of personal items in the car, and there *was* evidence that Alberto tried to hide the firearm by twice informing Officer Duffy that he did not have a key to the glove compartment when, in fact, he did have the key.

needed to be established", resulting in a verdict "contrary to the weight of the evidence."

(Doc. 104, at 6).

   During the jury's deliberations, the jury sent a note to the Court asking:

   We are requesting clarification of "on or about august 12" in interrogatory 1.

   Does 1 or 2 or 3 etc weeks prior to august 12 still constitute possession or is
   possession at <u>any</u> time prior to august 12 constitute possession.

   Is there a limit of time?

(Doc. 93) (underline in original). Following consultation with the parties, the Court wrote the

following response to the jury's question: "I refer you to Instruction # 8 of the jury

instructions (page 10-11) and the third full paragraph of the instruction on page 17." (Doc.

93, at 2).[8] The Government and Defendant both stated that this response was acceptable

to them. (*See* Trial Tr., May 7, 2025, at 87).

---

[8] Instruction # 8, titled "On or About", incorporated Third Circuit Model Criminal Jury Instruction
3.08, and stated as follows:

   You will note that the Indictment charges that the offenses were committed "on or about" a
   certain date. The Government does not have to prove with certainty the exact date of the
   alleged offense. It is sufficient if the Government proves beyond a reasonable doubt that the
   offense was committed on a date reasonably near the date alleged.

(Doc. 91, at 10-11). The third full paragraph of the instruction on page 17, which consists of a portion of
Third Circuit Model Criminal Jury Instruction 6.18.922G-4, states:

   To establish the second element of the offense, the Government must prove that Mr. Alberto
   possessed the firearm in question. To "possess" means to have something within a person's
   control. The Government does not have to prove that the defendant physically held the
   firearm, that is, had actual possession of it. As long as the firearm was within Mr. Alberto's
   control, he possessed it. The Government does not have to prove that the defendant either had actual possession of the
   firearm or had the power and intention to exercise control over it, even though it was not in
   his physical possession – that is, that the defendant had the ability to take actual possession

Defendant's argument that the jury's question demonstrates that it was "confused", and that this Court should therefore find that the verdict is against the weight of the evidence, is without merit.

As the Supreme Court has noted, "[a] jury is presumed to follow its instructions. . . Similarly, a jury is presumed to understand a judge's answer to its question." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (internal citation omitted). It is further assumed that the jury will inform the Court if it needs further clarification. *See id.* (quoting Chief Justice Marshall's opinion in *Armstrong v. Toler, 11 Wheat.* 258, 279, 6 L.Ed. 468 (1826), stating that "[h]ad the jury desired further information, they might, and probably would, have signified their desire to the court. The utmost willingness was manifested to gratify them, and it may fairly be presumed that they had nothing further to ask."). As the *Weeks* Court continued, "[t]o presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer." *Id.* In addition, it is well-established that a Court generally cannot inquire into, or attempt to speculate, as to how the jury reached its verdict. *See e.g., United States v. Hird*, 913 F.3d 332, 352-353 (3d Cir. 2019) ("[A]s the [Supreme Court in *United States v. Powell*, 469 U.S. 57, 66 (1984)] noted, any assessment of the jury's rationale for its verdicts 'would be based either on pure

_____

of the object when he wanted to do so – you may find that the Government has proven possession. Possession may be momentary or fleeting.

(*Id.* at 17).

13

speculation or would require inquiries into the jury's deliberations that courts generally will not undertake.'"); *United States v. Herrera-Genao*, 419 F.App'x 288, 296 (3d Cir. 2011) ("we will not reverse a conviction based on mere speculation about the jury's rational deliberation process.").

Here, after receiving the jury's question, the Court conferred with counsel and provided a written response to the jury, to which no party objected, directing the jury to relevant portions of the written instructions which each juror was provided.  The jury did not request any further clarification or send any subsequent questions to the Court.  This Court assumes that the jury followed its instructions and understood the Court's answer to their question.  Without speculating as to the jury's deliberations prior to, and after, receiving the Court's response, there is no basis to find that the jury's confusion, if any, was not remedied by the Court's written response.

For the reasons set forth herein, the Court rejects the defendant's assertion that "[t]here was no direct evidence produced and the evidence caused the Jury to be confused on the issue of when possession needed to be established. . ."  (Doc. 104, at 6). Rather, the weight of the evidence supports the jury's verdict beyond a reasonable doubt and there is no "serious danger that a miscarriage of justice has occurred", *Silveus*, 542 F.3d at 1005.  Thus, for the reasons set forth in this memorandum opinion, Defendant Alberto's motion for a new trial will be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Defendant James Raymond Alberto's

"Motion for New Trial and to Vacate Judgment" (Doc. 103).  A separate Order follows.

Robert D. Mariani
United States District Judge